May it please the court. My name is Ted Chandler. I was appointed by the court as pro bono counsel for the petitioner, Pejman Tofighi, and with me is Peter Kong, also appointed pro bono counsel, and I'd like to reserve two minutes for rebuttal. Ten years ago, Mr. Tofighi fled Iran. Today he is here in the courtroom. He's wearing the tan suit. With him is his wife and three children, all of whom are United States citizens. The fact that Tofighi is married to a U.S. citizen and has children who are U.S. citizens is relevant both to the adjustment of status claim as well as the asylum and withholding claim. The asylum and withholding claim is set out in the briefs. It's based on well-established precedent. So what I would like to do is start with the adjustment of status claim, which is not an issue that I have found in any published opinion in this court. It's a little bit more unique. So turning to the adjustment of status claim, the Attorney General has taken the remarkable position that this court has no choice but to split up Tofighi's family and send Tofighi back to Iran, and that's simply not true. This court does not have to split up his family, nor should it. Mr. Tofighi has an approved I-130 visa petition based on his bona fide marriage to a United States citizen, and thus normally he would be eligible for an adjustment of status. The only arguments that have been made against the adjustment of status have been procedural, the 10-year bar and the 90-day deadline. As I will explain, the BIA erred as a matter of law when it held that the 10-year bar applied to Tofighi. Thus, this court should reverse that ruling and remand with respect to the 90-day deadline, because on remand, once the 10-year bar is out of the way, there's every reason to believe that the Department of Homeland Security will exercise its discretion and set aside the 90-day deadline and grant him. And the reason you're saying that the 10-year bar is out of the way is because you say he didn't, in fact, have voluntary departure because he didn't pay for his bond. Is that the reason? Correct. What evidence is there in the record that that's the case? Well, Your Honor, the absence of evidence is itself evidence. If he had paid the $500 bond, the Attorney General should have a record of that, and it should be in the record. So in other words, the fact that there is no evidence in the record is still – Do you think that ordinarily this is in the record? I've seen lots of records. I haven't looked for this, but I've never seen any – I've never focused, at least, on an indication in the record that the bond was, in fact, paid. I'm at a disadvantage. I haven't seen a lot of records. This is my first record. So I can't tell you whether it's normally in there, but it should be in there if the government's going to use that fact against the alien. And also, there is a prima facie case in the sense that Tafigi has – there is evidence in the record that Tafigi did not have the money. But is there – has he submitted a declaration with a motion to reopen saying he didn't pay the bond? He could have. Well, that raises a point as to why would he have expected – so the way it works in the BIA is he filed his opening brief, and that talked about the request for an exercise of discretion. So he had no reason to believe in the opening brief that the Department of Homeland Security was going to raise this issue. The Department of Homeland Security raised it in the opposition brief. The Department of Homeland Security did not put in any evidence and had no statement about the $500 bond, and then that was it before the BIA. There was no right to a reply brief, and so Tafigi didn't have – But in the case he relies on – in the cases you rely on, there was affirmative evidence that the person did not pay the bond and there was no order. In that particular case, but there's no reason to say that the case turned on that fact. And again, there is evidence that a prima facie case that he didn't have the money. There's both the fact that he twice testified that he wouldn't be able to afford it, and then he filed a declaration for the appeal. On that point, going back to the original hearing where he first consented to deportation, doesn't the record establish that he expressed some concerns about – financial concerns about paying the bond, had an off-the-record discussion with his attorney, and then came back and said, sure, I have the money? Well, that's correct except for the last statement. I mean, to be precise, he said, yes, I'll provide it. So it's a little garbled as to what he said. But then even after that statement, his attorney came back and asked the immigration judge to set aside the bond because the attorney told the immigration judge that Tafigi was in financial trouble. And then again after that in the record is the declaration by Tafigi saying that he didn't have enough money to pay the $110 appeal fee. So the record establishes that he did not have a $500 bond. And also as the BIA published in its recent decision in Ray Diaz-Rocco, it's often going to be the case that an alien is not going to have the $500 at hand to pay within five days. And Diaz-Rocco holds that if there's no bond in there for no order, the bar doesn't apply? Absolutely. Is there anything else you want to say on this issue? Because I'd like to go to the asylum issue a little bit. Okay. Well, I mean, the issue is that the reason it's important is once it's set aside, the DHS has a policy with respect to the 90-day deadline. So if the 10-year bar is set aside, the 90-day deadline is not a jurisdictional bar. If it's romantic, there's every reason to believe that the DHS would join and the 90-day deadline would be set aside. So turning to the asylum claim. Why is that? Pardon me? Why is that? That's in the regulations that there's a 90-day timeline for a motion to reopen. It's a stated policy. It was quoted on pages 51 to 52 of our opening brief, and it's quoted in the BIA's decision in re Valarde-Pacheco, 23 INN decision 253 to 255. And it's very important. As a result of that policy, that's why the BIA came out with the en banc decision in re Valarde-Pacheco, and they actually granted adjustment of status to an alien in very much a similar situation as Tofigi, who had married shortly after applying for asylum. So pending the appeal, the BIA agreed to adjust the status based on the policy of the DHS. So you're saying that it is the settled policy of the INA at the moment to disregard the 90-day? No. I'm saying the DHS has a policy that in its discretion it will. DHS will consider factors as to whether or not they believe the alien merits an exercise of favorable discretion. But in this case, there's every reason to believe the DHS would exercise its discretion because it has already considered Tofigi's marriage and has already found that it was a bona fide marriage. So the fact that they've looked at his marriage, they've established that it's bona fide, that's the reason they granted the I-130 visa petition because that shows that they believe it's a bona fide marriage. And, again, the only issue for DHS is the 10-year bar. And once that's set aside, the 90-day deadline is not. As to asylum, the premise of the BIA's refusal to reopen on changed circumstances with regard to the religion claim, as I understand it, was its understanding that the IJ had a long time ago determined that he was not, in fact, a Christian, essentially, and that without that premise, the whole changed circumstances are relative. Is that your understanding of what they decided? Yes, I agree. And do you think that that is what the IJ originally decided? Well, there's no adverse credibility finding. Again, it's an ambiguous statement. He said to me he's generally credible, and then the next breath he said, well, but I've got serious doubts about the genuineness of his conversion. But then later he said, I don't believe the conversion was genuine. So what I got out of that was, well, he may be going to church and all that, but he doesn't really believe any of this. Does that make a difference? That he's – That he doesn't really – that his conversion may have existed, but it wasn't genuine. Does that matter? Well, I mean, I think it's the perspective of the persecutor. I mean, if the persecutor believes he's Christian, they're going to persecute him regardless of whether, you know, he actually believes it. But that wasn't my reading of the IJ's decision. I mean, ultimately he held on the fact that he thought Tafigi would practice in hiding. And that's the – Well, you read the Ninth Circuit cases wholly, that even if the original decision was unfavorable on that point, a square fact conclusion that – or fact finding that Mr. Tafigi was not a bona fide Christian, that he was simply using that as a means to stay in the country. Even if they'd made that, your contention is that in the petition to reopen, the agency must look at both new evidence and old evidence and reconsider that. And that if they – whether they do or not, you may appeal to or seek review in this court of that ultimate conclusion. That is your position? My time is out. The position is that they have to take Tafigi as they find him now, but also our position is that the IJ did not make a clear finding that he wasn't Christian. Thank you. Thank you very much. Thank you for your argument. Counsel. May it please the Court, my name is Adam Donnell, and I represent the respondent in this case, the Attorney General. Petitioner Tafigi's asylum claims have been adjudicated. He was represented by counsel before an immigration judge. The immigration judge denied – But the immigration judge, I mean, did not – do you think the immigration judge found that he wasn't, in fact, a Christian? Yes, Your Honor. I think that the – Where do you find that? I think the immigration judge's opinion is clear. He states both what you referenced earlier, that he had genuine doubts, or he had doubts as to the genuineness – But that under our case law would not qualify as an adverse credibility finding with regard to the assertion, right? That's right. He found the petitioner generally credible. All right. He had problems with the objective evidence. Problems, but he never – all right. But he never said – he never found that he wasn't, in fact, a practicing Christian. I believe that's what the opinion states. Where does it state that? He references that – this is in the administrative record at page 259 that he had – he would not believe that petitioner's conversion is genuine in nature. But that's different. That's a different statement. In other words, it's a judgment about how much he believes in Christianity as opposed to whether he's been, in fact, as he says, going to Christian services and acting like a Christian. And, Your Honor, due to this ambiguity, petitioner had a chance to file a petition for review of both the IJ's order and the subsequent BIA order affirming it. The initial asylum proceedings are not before this court. I understand that. But the BIA – but what is before the court is the different question of whether there are changed circumstances with regard to whatever circumstance Mr. Tafigi is in or was in. Now, I understand – and you're right, I think, to the degree you say that this changed circumstance has to be a circumstance in the country, and therefore the fact that he now has more children, all that, may not be relevant. But what about the question of whether there are changed circumstances with regard to the position of Christians in Iran? Well, Your Honor, to be clear, it's not necessarily changed circumstances that is the standard. The 90-day deadline barred him from bringing the motion to reopen. The only way to escape the 90-day bar, which is not just in the regulations, it's by statute, and Congress explicitly put that in there because they were tired of delayed motions to reopen coming, and they wanted finality in the process. Now, it's not just changed certain – Okay, go ahead. I'm sorry. The test is that there are changed country conditions that material affect the asylum claim. That's what I was saying. All right. He could file a second asylum petition, though, and then he wouldn't have this problem, right? Well, he could. I think that his asylum claim has already been adjudicated and it's done. Matty, can I just file a second one? And the regulations say you can. And in that case, the changed circumstances doesn't have to be country conditions. It can be just changed circumstances. Well, if that's what he wishes to do, but I think that's outside the scope of these proceedings. Okay. So for these proceedings, because he filed the motion to reopen, it has to be changed country conditions, which is what I was saying, which is why I'm saying that I think that insofar as your position is that his changed circumstances don't matter, I think you're right. But what's troubling me is your reliance on the notion that there's already been a determination that he wasn't in fact a Christian in the sense that somebody would think he was a Christian. Well, Your Honor, I think it's important to look at both the motion to reopen and what evidence was actually before the board when they made their decision and the actual decision of the board. The board stated that they did not find that these conditions, this supposed new evidence that was brought before them, evidenced any materially changed country conditions that would affect his claim. They then follow up by stating, and to the extent that this would be evidence regarding his Christian conversion claim, we think that the IJ found that he had not converted and that was their finding. But I think it's important to note that the board looked at all the new evidence, and if you look in the record and compare what evidence was actually before the IJ at the initial asylum hearing and subsequently before the board on this motion to reopen, there are no changed country conditions. If you juxtapose the two, yes, it's well known that Iran's human rights record is abysmal. That was stated in the initial evidence that was before the IJ, and the IJ rejected this asylum request at that time. Tufey could not escape the 90-day bar, and subsequently his changed country conditions were nonexistent in the eyes of the board. What about his argument that while it is true that the only statutory or regulation exception to the 90-day bar is the changed country conditions, the subtle policy of the agency is to simply disregard that bar and look to the current circumstances of the petitioner? Your Honor. Only the 10-year bar that they contend has been eliminated by an en banc decision of the agency that stands in his way. Your Honor, that position is flat incorrect. Initially, the 90-day bar was treated as mandatory and jurisdictional, much like the 30-day deadline for petitions for review. Subsequently, as case law developed, this was in the Sokop Gonzalez case, it found that, yes, the 90-day bar is not mandatory and jurisdictional in that nature. It's still required, but we will make exceptions if the petitioner can establish a tolling claim, an equitable tolling claim of some kind. That was never brought before the board in this case. It's never been argued by counsel at any stage of this litigation that there's an equitable claim, and, in fact, neither in anything that has been filed in this court before the board or the immigration judge has any reason for the 500-day delay been given at any time. Can I ask about the voluntary departure and the agency's new case about this? Is there, in fact, in the record, an order, a voluntary departure order? There is nothing in the record that indicates whether or not he paid the voluntary departure bond. Would there be or is there ordinarily such an indication? To my knowledge, there's not, because at that time that this case was decided, no one knew that this would ever be an issue until this board came in. What about just is there something that ordinarily shows up in a record that is called order of voluntary departure? I mean, is there a piece of paper that says that here's an order of voluntary departure? Outside of the record, we did do a search, and we could not find evidence that he paid the bond. But the important thing is that this was never exhausted before the board, and the only evidence that's in the administrative record, which is what we look to since this is administrative. When was the BIA opinion making this a pertinent consideration? This was in 2006 during the course of briefing on this case. Does that make a difference in terms of exhaustion? I mean, wouldn't the agency want us to just remand him? He could consider whether it applies or not. Well, I think it matters that he could have brought forward evidence that this, he did not pay the bond if he wished to make that argument. But the law didn't exist. I mean, these case law didn't exist at the time. You just said nobody would have known it was relevant, so that would presumably include him. So, therefore, wouldn't it make sense in light of the fact that this was not a development that could have been anticipated and that you have just said couldn't have been anticipated to simply remand to the board and say, you know, look at this and consider it in light of your new case? If the board had wished to remand, they could have accepted that and gone that way. But the fact is that this – My understanding is that this case, you said it was during the briefing. I thought you meant here. Right. Okay. Now, I think it's important that this is a motion to reopen, and a motion to reopen while plainly disfavored relies on new facts or new evidence. This is not before him. What is new facts or new evidence in terms of his adjustment of status eligibility? That's new, right? It's new. Right. That would qualify as new evidence. Because the only issue is whether there's a bar. And that's barred by the 90-day. Okay. Now – Is he wrong about the fact that if the 10-year bar didn't apply, the agency would be likely to weigh the 90 days? I don't see that as the case, and I think it's clear in the board's order that there were alternative bases for their finding. And I don't think that that in any way – What about this Velardi case he was talking about, which I've not read? I think that's the name of the case. That case – He was referencing some case that he says demonstrates that. And it makes sense because we had this the other day. It's impossible to figure out how the 90 days and the 10-year bar could operate together if you weren't willing to weigh the 90 days for the 10-year bar. It wouldn't make any sense. That was a case that specified that it's not mandatory and jurisdictional, like the 30-day position for review. All right. Well, in general, if the agency is going to allow – is going to recognize the 10-year bar, how is it going to apply the 90 days? I think first you have to open the door of the 90-day bar before you can ever make that. So you think that 90 days from the original decision, even though there's a 10-year bar from then? I think that the 10-year bar and 90-day bar apply simultaneously. Those are two separate grounds. You have to get through both of them to be able to reopen. So you think that in order to take advantage of the 10-year bar, you have to – within 90 days of the original decision, 10 years before, you have to apply for a motion to reopen, even though you have nothing to reopen at that point because you have a 10-year bar. No. The 10-year bar is barring you from pursuing relief for 10 years from when you don't leave, basically. Okay. So what happens at the end of the 10 years? At the end of the 10 years, presumably, you could apply for a – Why about the 90 days? The 10-year lists a laundry list of things that you can't do. The 90-day is specific to reopening, which is only for new facts. Now, in a case where – If he had left on a voluntary departure order, if he had, in fact, voluntarily departed, and he spent his 10 years in the other country, would he be able to then be admissible or potentially admissible into the country and be able to apply for lawful permanent resident or some form of relief? My understanding is that he could seek any number of types of relief. Now, he could never seek to reopen the proceedings of the board because once that 90-day window closes, it's done. Now, that requires – Are there forms of relief available? Excuse me? Are there other forms of relief available? Yes, Your Honor. There's – even at this point, even if this court were to affirm the board's order, DHS can decline to exercise removal. There's any number of other options for removal. In fact, just – Any other number? What are they? Of what, Your Honor? Are there any number of other options? What are they? One would be that he could still apply for a visa once he is out of the country. Adjustment of status is just – What about relief from deportation? DHS still has prosecutorial discretion whether or not to remove him. That's the first one. But what are the – any number of other ones? That's the only one on the top of my head. So there are no other ones? There may be. I'm just – I'm not aware of them. Counsel, following up on one of Judge Berzon's questions and getting back to a point, one of the things that has troubled this panel has been that there seems to be an inconsistency between telling an applicant you must seek to reopen within 90 days and also telling him at the same time that either unless you pay the bond you can't apply or if you can't pay the bond and don't, there's a 10-year ban on any kind of relief at all. Is it your suggestion that during the 90 days to seek reconsideration, the 10-year ban is suspended? In other words, if he'd come in within the 90 days, would he immediately be met by the 10-year ban? The moment that he does not depart or when his voluntary departure period ends, yes, both reopening – It would have been useless to apply within that time period. Whether it was reopening, whether it was requesting some other form of relief. So the 10-year bar becomes meaningless because it means that he – the 90-day procedural limit then supersedes the 10-year substantive determination that's in the statute, and there's no way to ever invoke it even after the 10 years runs, right? That's what you're telling us. On a motion to reopen, that's right, Your Honor. Yes, but it has to be a motion to reopen because it's relief from deportation. If you want to get relief from deportation, you have to reopen your order of deportation. Otherwise, you're not going to get relief from the deportation. That's right. So it becomes functionless. In regards to a motion to reopen that's filed after 90 days, yes. Now, there are other forms of relief that it would also shut down, like cancellation of removal and other things. And they're going to be in the same position because you're still going to have the 90-day problem. The 90-day problem only is invoked when it's a motion to reopen with new facts. But you would have to reopen the order. I mean, this is just an annoying argument, and the only way you're going to get relief from a deportation order is to reopen it. What else are you going to do with it? If it's in effect, then you're not getting relief from it. We had the same problem the other day, and I really wish the agency would come to some explanation of this, because it doesn't make any sense. I don't know the answer, but there has to be one. And telling you there isn't a problem isn't the answer. Well, the board found that both bases worked at the same time. Okay.  Thank you, Your Honors. Thank you, Counsel. The case of Tafdigi v. Gonzales is submitted. And we will go on. The next case, Chavez-Rigolato v. Gonzales, is submitted on debrief, so we'll go to Davis v. Gonzales.
judges: Berzon, Ikuta, Singleton